## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| THE ESTATE OF | * | |
| MARY ELLEN CRANMER NICE, | * | CIVIL ACTION NO. 18-7362 |
| Plaintiff | * | |
| | * | |
| | * | |
| Versus | * | SECTION: H (3) |
| | * | |
| | * | |
| | * | |
| THE UNITED STATES OF AMERICA, | * | |
| Defendant | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

### MEMORANDUM IN SUPPORT OF
### PLAINTIFF THE ESTATE OF MARY ELLEN CRANMER NICE'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW Plaintiff The Estate of Mary Ellen Cranmer Nice, who, through undersigned counsel, respectfully submits the following memorandum in support of her motion for partial summary judgment.

### STATEMENT OF UNCONTESTED FACTS[1]

On August 2, 2018, Plaintiff Mary Ellen Cranmer Nice, acting through her judicially appointed curatrix, Julianne Nice,[2] filed a complaint against the United States for a refund of $519,502 in federal income taxes, plus interest and penalties for the tax years 2006, 2007, and 2009 through 2013. Plaintiff had previously paid the taxes, interest, and penalties assessed for those years.

---

[1] This statement of facts is based upon the one set forth in Plaintiff's separate "Statement of Uncontested Facts." All Exhibits referred to in this Memorandum form part of that Statement.
[2] Mary Ellen Cranmer Nice died on March 21, 2019. On April 23, 2019, this Court entered an order substituting The Estate of Mary Ellen Cranmer Nice as the Party Plaintiff in this action. The Estate appears herein through its Independent Executor, Julianne Nice. *See Doc. #16.*

The crux of Plaintiff's complaint was and is that she had been compelled[3] to pay these federal income taxes on income that she had not actually or constructively received, because that "income" had been diverted by her son, Charles M. "Chip" Nice III,[4] for his own use and benefit.[5] The undisputed facts in support of this claim are given below.

Mary Ellen is a cash basis taxpayer, whose husband, Charles M. Nice, M.D. ("Dr. Nice") predeceased her in 2002.

Mary Ellen Cranmer Nice was married to Dr. Charles M. Nice, Jr. for 61 years. There were eight (8) children born during their marriage. During his lifetime, Dr. Charles M. Nice, Jr. managed the financial affairs of the household. Because Dr. Nice worked very hard, and was frugal, he accumulated substantial assets – assets sufficient to provide for the care of Mary Ellen Cranmer Nice for the entirety of her life.

Dr. Nice died in 2002, leaving a will in which Chip Nice was named the executor of his father's estate. Beginning in 2003, and continuing up to November, 2014, Chip Nice exercised total control over the assets of his father's estate, and over the assets of his mother, Mary Ellen Cranmer Nice.

Mary Ellen Cranmer Nice began exhibiting symptoms of mental incapacity in 2005. By 2007 Mary Ellen Cranmer Nice was suffering from dementia and was formally diagnosed with same that year by her physician, Dr. Nona Epstein. On September 20, 2007, the Taxpayer was diagnosed with "Probably early dementia." By that time (2007) Mary Ellen Cranmer Nice was

---

[3] The compulsion took the form of liens placed on property, and garnishments placed on other income.
[4] Charles M. Nice III, the son of Charles M. Nice, Jr., will hereafter be referred to as "Chip" Nice, to avoid confusing him with his father.
[5] *See* ¶¶ 14-15, and ¶ 27 of Plaintiff's Original Complaint, Doc. #1.

completely incapable of handling her personal financial affairs because of her cognitive impairments.  Further, Mary Ellen Cranmer Nice had no capacity to contract as of 2007.

On February 26, 2008, the diagnosis was changed from "probable dementia" to "dementia," and Aricept was prescribed.  The doctor also noted that Mary Ellen tended to hide her deficiencies and that she could not remember the birth of her grandchild on several occasions or conversations that had taken place. By this time, Mary Ellen was suffering from both short-term and long-term memory loss. Her primary care provider made the decision to treat her with Aricept which is used to treat mild to moderate dementia, caused by Alzheimer's disease.[6]

Mary Ellen Cranmer Nice's Alzheimer's diagnosis was confirmed on March 12, 2008, when a CT scan of the Taxpayer's brain showed that she was suffering from "age appropriate generalized cerebral volume loss with mild decreased attenuation in the periventricular white matter suggestive for chronic micro vascular ischemic change." The dosage of Aricept was then increased, and her dementia prognosis monitored at subsequent doctor's visits on June 12, 2008, January 15, 2009, and March 24, 2009.[7]

Mary Ellen's primary care physician for the years involved, Nona Epstein, executed the affidavit dated October 8, 2016[8] (attached to Plaintiff's Statement of Uncontested Facts as Exhibit C) attesting that:

1. Mary Ellen suffers from progressive dementia which is a set of symptoms that progressively worsens, affecting memory, thinking, and social abilities severely enough to interfere with daily functioning.

---

[6] See Mary Ellen Nice's medical records, Bate Stamped Nice 000238-000239, attached as Exhibit D to the Statement of Uncontested Material Facts.
[7] *Id.*
[8] Mary Ellen Cranmer Nice was alive at the time of this affidavit, hence it is written in the present tense.

2. In Dr. Epstein's opinion, Mary Ellen's mental impairment has prevented her from managing her financial affairs.

3. Mary Ellen's dementia is incurable and has persisted for a period of more than twelve (12) months.

4. Mary Ellen's mental impairments have prevented her from managing her financial affairs from no later than February 26, 2008, and that Mary Ellen remains unable to care for her finances due to her mental impairments.

No later than 2005, Chip Nice began withdrawing large amounts of money from the bank account of his mother, Mary Ellen Cranmer Nice. Chip Nice routinely had his mother write him checks for large sums, though she lacked capacity to do so. These funds were then deposited into various accounts bearing Chip Nice's name. To accomplish these withdrawals, Chip Nice would have his mother sign one or more blank checks. Chip placed authorizations and checks in front of his mother and insisted she sign them, knowing that she lacked the capacity to understand what was happening.

Chip Nice would then fill in the amount, and the payee – usually himself. These checks would then be deposited into Chip Nice's own bank account. Thereafter, Chip Nice would use the vast majority of the funds in his account for his own benefit, including paying his numerous credit cards.

Unbeknownst to Mary Ellen or Chip Nice's siblings, Chip Nice opened checking accounts in both his and his mother's name and diverted funds into these accounts as well, and then distributed the funds to his personal accounts used for his personal benefit, at his sole discretion. Additionally, Chip Nice caused distributions from Mary Ellen's retirement plans, which were then diverted into Chip Nice's own accounts. He also made electronic transfers from his mother's

accounts into his own accounts to circumvent dealing with the bank. Finally, Chip Nice placed his name on Mary Ellen's credit cards to spend unfettered, without arising suspicion.

Although Chip Nice claimed he was self-employed, his Social Security statements have shown he had no (zero- 0) quarters of income for Social Security purposes.  Chip's personal account statements also showed electronic transfers from his mother's accounts into his own account, which were then used to make American Express payments. Chip Nice had his own card attached to the American Express bill, and when given for discovery, numerous charges on the bill had been redacted so that only his mother's expenses were viewable.

Because of her dementia, by 2007 Mary Ellen Cranmer Nice was completely unaware of: (i) withdrawals from her retirement accounts; (ii) deposits into her bank accounts; (iii) withdrawals from her bank accounts; (iv) the sources or amounts of deposits made to her bank account, (v) or the amounts or purposes of the withdrawals made from it.  By 2007, the withdrawals by Chip Nice were both frequent and substantial.  To supplement lifetime annuities that were being paid into the account, Chip Nice caused his mother Mary Ellen Cranmer Nice to sign blank withdrawal slips for her retirement accounts. This resulted in an extreme depletion of the assets that had been set aside to provide for Mary Ellen Cranmer Nice.

Chip Nice had no gainful employment between 2005 and 2014, and had no income during this period other than sums that were taken from his mother's bank account.  To conceal his conduct, Chip Nice represented to his wife, and to other members of his family that he ran one or more successful internet businesses, of an unspecified nature.

Early in 2011, Chip Nice's sister Julianne Nice expressed concern regarding her mother's health, and finances, and Chip Nice's management of both.  In response, on October 26, 2011, Chip Nice fraudulently obtained a power of attorney from Mary Ellen Cranmer Nice, one that

purported to give him complete legal control over her person and financial affairs.  (This power of attorney was subsequently judicially declared to be an absolute nullity, and thus void *ab initio*).

In 2011, Chip Nice also began <u>submitting</u> tax returns purporting to be the returns of his mother, Mary Ellen Cranmer Nice who had not filed since 2005 as a result of her dementia.  These returns were fraudulent, because they purposefully did not correctly state income or expenses, nor did they reflect the fact that Chip Nice had diverted substantial portions of the funds at issue.  More significantly, only a portion of the taxes due with the returns were paid by Chip Nice, which generated significant tax liabilities, and interest, and penalties.

The tax returns originally submitted by Chip Nice in Mary Ellen Cranmer Nice's name for the years 2006, 2007, 2008, 2009, 2010, 2011, 2012, and 2013 were invalid as Mary Ellen since no later than February 2008 did not have the capacity to know what she was signing and therefore was incapable of signing a tax return.

Early in 2014, Julianne Nice became aware that some of the funds set aside for her mother's benefit had been depleted – although she did not learn of the extent of the depletion, or the manner in which it had been accomplished by Chip Nice until 2015, when she was judicially given control of her mother's person and property as a result of an interdiction proceeding she had initiated.  Chip Nice died on January 1, 2015.

During the years 2006 through 2014, Mary Ellen Nice's access to her bank accounts, and thus any funds deposited into her bank accounts, was wholly restricted by Chip Nice and by Mary Ellen Cranmer Nice's dementia.  Chip Nice maintained control over Mary Ellen Cranmer Nice's physical person, check book, electronic access, and cards accessing the accounts of Mary Ellen Cranmer Nice.

Upon gaining access to the financial records of her mother and reconstructing the records with the assistance of two different accountants, Julianne Nice learned that her brother Chip Nice had improperly taken the vast majority of her mother's assets and funds and had severely depleted her retirement accounts.  Moreover, Chip Nice had otherwise neglected Mary Ellen Cranmer Nice's financial affairs, resulting in federal tax liens upon the family home at 508 Millaudon Street. This property was sold in 2016, and all federal tax liens were paid at that time.

Amended tax returns were filed and claims for refunds were made.  Because the United States refused to pay refunds for the tax years 2006, 2007, and 2009 through 2013, this suit was instituted.

<u>LAW, AND ARGUMENT</u>

The critical issue for this partial summary judgment[9] is whether the funds which Chip Nice caused to be distributed and deposited into Mary Ellen Cranmer Nice's bank account must be deemed "income" to her, even though: (i) she was unaware of the funds; (ii) could not and did not actually exercise control over the funds; (iii) was substantially restricted from access to and from using the funds due to Chip Nice's control; and (iv) did not benefit from the funds, except to a very limited, and indirect extent.

The answer to these issues is that these funds are not income to her – they were income to Chip Nice.  A discussion of the law governing "income" is given below, after a brief (and perhaps unnecessary) discussion of the law governing summary judgment.

---

[9] Plaintiff has moved for <u>partial</u> summary judgment because if this issue is resolved in its favor, all that remains is a determination of the amount of "income," if any, that can be attributed to Mary Ellen Cranmer Nice.  Although counsel contend that the amended tax returns filed on behalf of Mary Ellen Cranmer Nice accurately reflect that amount, that issue is not before the Court at this time.

**1. The Standard for Summary Judgment**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* at § (c)(1).

As summarized by the Fifth Circuit in *Lindsay v. Sears Roebuck and Co.,* 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.* at 322; *see also, Moody v. Jefferson Parish School Board,* 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint.... Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89 (1990) (internal quotation marks and citations omitted).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts....[s]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*) (citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "[c]redibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.,* 308 F.3d 451, 458 (5th Cir.2002). To the contrary, in reviewing the evidence, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Peel & Co., Inc. v. The Rug Market,* 238 F.3d 391, 394 (5th Cir. 2001).

Defendant the United States has deposed every witness listed by Plaintiff on its witness list, save one, and has yet to produce a single piece of evidence that contradicts, or even undermines the allegations made by Plaintiff in the complaint.  Thus, the only question remaining is one of law – and that too must be resolved in Plaintiff's favor.

## 2.  Receipt of Funds

Section 61 of the Internal Revenue Code of 1986, as amended (hereinafter, referred to by IRC and section number), defines gross income to include funds received from dividends, annuities, and pensions, among many other sources.  Treas. Reg. §1,61-1(b)(3) refers to IRC §451 to determine the, "… taxable year for which an item of income is to be included in gross income…"

IRC §451(a) states as follows:

451(a)  GENERAL RULE.— The amount of any item of gross income shall be included in the gross income for the taxable year in which **received** by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period. (Emphasis added.)

Treasury Regulation §1.451-1(a) states that gains, profits, and income are to be included in gross income for the taxable year in which they are actually or constructively received by the taxpayer.

### A.  Actual Receipt – the law

Actual receipt occurs when income is reduced into the possession of the taxpayer. Treas. Reg. 1-451-2(a). "It is settled law that income which is subject to a taxpayer's unfettered command and that which he is free to enjoy at his own option is taxed to him as his income whether he sees fit to enjoy it or not." See *Corliss v. Bowers*, 281 U.S. 376 (1930).

However, Courts have routinely held that even where income is reduced to the possession of a taxpayer by deposit into an account owned by the taxpayer, actual possession does not occur when the possession of the taxpayer is hindered through no fault of the taxpayer, and taxpayer is not free to enjoy the funds at her own option.

In a similar case involving distributions caused by a family member which were appropriated by the family member, *Roberts v. CIR,* 141 T.C. 569 (2013), the taxpayer and taxpayer's wife maintained two joint accounts, and taxpayer had IRA accounts with two companies.  Without taxpayer's knowledge, taxpayer's wife caused distributions from taxpayer's IRAs into one of their joint accounts to which taxpayer's wife maintained access and control over. Despite the taxpayer having his name on the account, the court found that the taxpayer had not received the IRA funds.  Due to the lack of receipt by the taxpayer, the taxpayer was not liable for income tax related to distributions from his IRA accounts caused by his wife.

In *Leslie v Commissioner of Internal Revenue*, T.C. Memo 2016-171 (2016), the taxpayer's ex-husband set up an account in both their names and deposited required settlement funds into the account for her use; however, he prevented her access to the account.  The Tax Court determined that even though deposited to an account in her name, taxpayer did not receive the deposited payments and was not required to include them in the year her ex-husband deposited them.[10]

---

[10] See also *Single v. C.I.*R, T.C. Memo 1988-549 and *Mudd v C.I.R.*, T.C. Summ. Op. 2004-1, cases in which each spouse of the taxpayer diverted funds of the taxpayer (tax refund check and IRA distributions respectively) without the taxpayer's knowledge, each spouse using the funds for her own benefit.  The Tax Court held that the taxpayers were not liable for the taxes owed on the funds not received.  See also *Alsop v. C.I.R.* 290 F.2d 726 (2d Cir. 1961), affg. 34 T.C. 606 (1960) (royalties embezzled by the author's literary agent, only includable in the author's income upon recovery from her agent; the Tax Court and the United States 2nd Circuit Court of Appeal clearly holding that income can only be included in the year in which it was received, and that the appropriation of funds by another party prevents such receipt).

In accordance with IRC §451 and the resulting regulations, in cases such as these, where actual receipt does not occur due to the obstruction of taxpayer's possession, the issue becomes whether constructive receipt occurred.

B. *Constructive Receipt – the law*

Treas. Reg. 1-451-2(a) states in relevant part:

"Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions."

"The doctrine of constructive receipt treats as taxable income which is unqualifiedly subject to the demand of a taxpayer on the cash receipts and disbursements method of accounting, whether or not such income has actually been received in cash. See 2 Mertens, Law of Federal Income Taxation, Sec. 10.01 (1942)." *Ross v. Commissioner,* 169 F.2d 483, 490 (1ˢᵗ Cir. 1948).[11]

After determining a lack of actual receipt, the above cases cited in *Actual Receipt* determined whether constructive receipt had occurred.  In *Roberts* and *Leslie*, *supra* the taxpayer had funds deposited into an account in his or her name.  However, the actions of the respective spouses prevented constructive receipt by placing substantial limitations on the knowledge of distributions, knowledge of available funds, and limitations to access of the funds, thus preventing

---

[11] See *Ross v CIR*, at 491 where the court ruled: "'Income not reduced to possession.- Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner or payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and **its receipt brought within his own control and disposition**. [Emphasis Added]

constructive receipt. Similarly, in both *Single* and *Mudd*, *supra*, both spouses of the respective taxpayers hid the receipt of funds from the taxpayers, thus preventing taxpayers use of the funds and preventing constructive receipt.

### C. No Actual Receipt – the facts of this case

There is no genuine issue of material fact in the present case over actual receipt. Mary Ellen Cranmer Nice did not actually receive the funds which Chip Nice included in the fraudulent returns for the 2006, 2007, 2009, 2010, 2011, 2012, 2013 tax years, as these funds were never rendered into her possession or control. Pursuant to IRC §451, income is only properly included in the year in which the income is **received**. Resulting regulations under IRC §451 including Treas. Regs. 1.451-1 and 1.451-2 go on to define receipt to be (i) actual receipt where the income is rendered into the possession of the taxpayer or (ii) constructive receipt, discussed in the following section. However, it routinely has been held that receipt can be prevented through actions of others designed to interfere with the reception.

As United States Supreme Court's held in *Corliss, supra*, income rendered into possession is "subject to a taxpayer's unfettered command and that which he is free to enjoy at his own option." These factors are not true for Mary Ellen Cranmer Nice. The accounts into which the funds were deposited were not subject to her unfettered command, and she was not free to enjoy such funds at her own option due to her son's actions in sequestering his mother from her accounts.

Mary Ellen Cranmer Nice was advanced in age and suffered from Alzheimer's disease, with the related dementia. In her Affidavit attached as Exhibit "D" to the Statement of Uncontested Facts, Nona Epstein, Mary Ellen's primary care physician noted Mary Ellen's mental decline, specifically noting that Mary Ellen was not able to care for her person or finances no later than

February 2008.  She lacked the ability to contract for herself and to understand what was happening with her finances.

Mary Ellen Cranmer Nice, who had previously been fastidious in her personal hygiene, was displaying signs that she was unable to care for her person or property as early as 2006, when she stopped filing her personal returns.  Plaintiff's counsel has submitted medical records, an affidavit from the medical professional who was well acquainted with Mary Ellen throughout the time period at issue, and depositions from family members who were interacting with Mary Ellen. All attest to Mary Ellen's impaired mental condition.  No evidence has been submitted to counter these facts.

Chip Nice moved himself into the family home and thereafter separated his mother from her account access physically by controlling her movements, correspondence, her checkbook, and debit cards.  During the relevant time, all checks issued from Mary Ellen's account were issued at the sole direction of Chip Nice, who had his mentally incapacitated mother sign blank checks and then filled out every check as he wanted, often times to himself.

As corroborated by depositions, affidavits, Social Security records, bank records, and credit card records, Chip held no job, and his only sources of income were the checks received by his mother, and the other distributions Chip compelled from his mentally disabled sister Debbie, whom he exploited in similar fashion. No evidence has been submitted to counter these facts.

This case closely mirrors *Roberts v. C.I.R.,* 141 T.C. 569 (2013).  In both *Roberts* and the case *sub judice*, both taxpayers had funds distributed from their retirement accounts to a bank account in their name which was not under their control due to the actions of a relative.  In both cases the taxpayer was unaware of the funds due to lack of access into the account.  In both cases,

14

the request to distribute funds from the retirement account was fraudulent, in *Roberts* due to forgery and in Plaintiff's case due to her lack of mental capacity.  In *Roberts* the Tax Court held that there had been no actual receipt.  In Plaintiff's case, the same holds true.

This logic is routine in deciding tax cases.  Again, in *Leslie v. Commissioner of Internal Revenue* T.C. Memo 2016-171 (2016), the Tax Court held that the taxpayer never received funds paid to an account bearing her name to which her access was prevented due to no fault of her own.  Here to, Mary Ellen was prevented from access to her accounts by the actions of Chip Nice, and because of her disease.

Defendant has not provided any evidence to suggest that Mary Ellen actually received the income, other than tax returns submitted by her abuser, which are known to be fraudulent: the returns could not have been legally signed by taxpayer.  The evidence demonstrating the absence of actual receipt of this income far outweighs any consideration that could be given to these fraudulent returns.  In sum, there is no *genuine* issue that Mary Ellen Cranmer Nice did not have these funds rendered into her possession.

No credible evidence to counter these claims has been discovered by defendant.  All the discovery conducted by defendant only gave further weight to Plaintiff's claims.  Accordingly, Plaintiff is entitled to judgment as a matter of law that she did not <u>actually</u> receive the funds at issue.

### D.  *No Constructive Receipt – the facts of this case*

There can be no genuine issue of material fact as the absence of constructive receipt by Mary Ellen Cranmer Nice.  When a taxpayer does not <u>actually</u> receive funds in a given year, the

taxpayer is still liable for funds <u>constructively</u> received as income in that year.  Treas. Reg. §1.451-2.

> 'To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner or payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within **his own control and disposition**. *Ross,* at 491. (Emphasis added.)

But for Mary Ellen Cranmer Nice to have <u>constructive</u> receipt of the funds withdrawn by Chip Nice over the years 2006, 2007, 2009, 2010, 2011, 2012, and 2013, the funds had to have been brought within **her own control and disposition**.  They were not.

In deciding issues regarding constructive receipt, the Tax Court and Appellate Courts have routinely and consistently acknowledged that limitations which are beyond the control of the taxpayer can prevent constructive receipt.

In *Roberts, supra,* the taxpayer's wife took actions to cause the distributions from taxpayer's IRA accounts, hid the funds received, and exercised control over the joint bank account so that taxpayer would have no knowledge of or access to the funds in question.  The taxpayer's wife held the only checkbook to the account, had the only card to the account, and received all statements from the account.

In the current case, Chip Nice separated Mary Ellen Cranmer Nice from her funds, and from control of those funds, in parallel ways.  Though Mary Ellen's name was on all accounts, Chip Nice kept the account checkbook, the account cards, and the account statements.  Because of her age, and mental disability, Mary Ellen Cranmer Nice was not physically able to visiting any banking location, and she otherwise had no access to her accounts; *i.e.,* by means of a computer.  She simply could not understand or control her own finances.

The Tax Court in *Roberts* found that similar interference by taxpayer's wife was a significant impediment to taxpayer's control, an impediment sufficient to prevent "constructive receipt" of such funds. Because Mary Ellen was subject to even greater impediments, either those created by Chip Nice, or those created by her disease, the result should be the same.

*Leslie, supra* also contained a discussion of another instance in which constructive receipt where actual receipt did not occur.  Once again there was an account in a taxpayer's name into which the taxpayer's ex-husband made deposits of amounts owed under their marital separation agreement.  When taxpayer went to remove the funds, taxpayer's ex-husband objected and refused to allow taxpayer access to the account.  The *Leslie* Court found that these funds were not income to the taxpayer in that case, because of a lack of control.

Accordingly, Plaintiff is entitled to judgment as a matter of law that she did not constructively receive the funds at issue.

<u>CONCLUSION</u>

Wherefore, because Mary Ellen Cranmer Nice neither actually nor constructively received the funds in question, Plaintiff respectfully requests a partial summary judgment in its favor, declaring that:

(i)     Except for the amounts of income reported by Mary Ellen Nice on amended income tax returns filed in 2016, the funds put into an bank account bearing the name Mary Ellen Cranmer Nice, without her knowledge, consent, or permission; and then removed from that bank account, without her knowledge, consent, or permission, over the years 2006, 2007, 2009, 2010, 2011, 2012, and 2013 were not "actually received" by Plaintiff; and

17

(ii)    Except for the amounts of income reported by Mary Ellen Nice on amended income tax returns filed in 2016, the funds put into an bank account bearing the name Mary Ellen Cranmer Nice, without her knowledge, consent, or permission; and then removed from that bank account, without her knowledge, consent, or permission, over the years 2006, 2007, 2009, 2010, 2011, 2012, and 2013 were not "constructively received" by Plaintiff.

Respectfully submitted, this 28th day of August, 2019.

*/s/ Michael A. Mayhall*
Michael A. Mayhall (LA. #09182)
THE MAYHALL LAW FIRM
724 E. Boston Street
Covington, Louisiana  70433
(985) 246-1700
mike@mayhalltaxlaw.com

*/s/ Herbert V. Larson, Jr.*
Herbert V. Larson, Jr. (LA. #08052)
THE LAW OFFICES OF
  HERBERT V. LARSON, JR.
700 Camp Street
New Orleans, Louisiana 70130
(504) 528-9500
hvl@hvllaw.com

18

## CERTIFICATE OF SERVICE

This certifies that I served the above pleading upon counsel of record for the Government by filing same with the ECF/CM system for the United States District Court for the Eastern District of Louisiana, which will automatically send the same to counsel via e-mail.

Date:  August 28, 2019.


*/s/Herbert V. Larson, Jr.*
HERBERT V. LARSON, JR.